UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

FRED IFILL,

               Plaintiff,

        -against-

NEW YORK STATE COURT OFFICERS
ASSOCIATION, ASSOCIATION PRESIDENT
DENNIS QUIRK in his individual and official
capacity, MICHAEL P. DeMARCO, in his
individual and official capacities, and JOHN
POSILLIPO, in his individual and official
capacities,

               Defendants.

-------------------------------------------------------X

**FILE COPY**

DOCKET NO.: 07-CV-7472
          (RMB)(DCF)

**AMENDED COMPLAINT**

SENT TO CHAMBERS
FOR REVIEW
NOV 12 2008
U.S.D.C.S.D.N.Y.
CASHIERS

        PLAINTIFF, FRED IFILL, by and through his attorneys, The Law Offices of Frederick K.

Brewington, submit the following Amended Complaint, with permission and/or leave granted by the

Court pursuant to *FRCP* Rule 15, and state and allege as follows:

## PRELIMINARY STATEMENT

        1.      This is a civil action seeking monetary relief, a declaratory judgment, compensatory

and punitive damages, disbursements, costs and fees for violations of the Plaintiff's rights, brought

pursuant to 42 U.S.C. § 1983, Civil Service Law § 209, and breach of contract/collective bargaining

agreement.

        2.      Specifically, the Plaintiff alleges that the Defendants (collectively and individually)

negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive

him of his Constitutional and common law rights, pursuant to the above mentioned statutes and

causes of action by committing acts under color of law and depriving the Plaintiff of rights secured

by the U.S. Constitution, the laws of the State of New York, and Defendants' own internal

laws/policies/procedures.

3.      Plaintiff alleges that the collective Defendants negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of his employment, position, title, right to due process, and pay through coercion, conspiracy, misrepresentation, misinformation, harassment, character assassination, and intentional breach of the collective bargaining agreement.

4.      Said acts were done knowingly with the consent and condonation of the NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO, with the express purpose of removing and silencing the Plaintiff, and generally violating his rights as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

## JURISDICTION AND VENUE

5.      The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343. This Court is requested to exercise supplemental jurisdiction with respect to Plaintiff's State Law claims pursuant to 28 U.S.C. § 1367.

6.      Venue in the Southern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the events and violations herein alleged occurred were in New York County (in part) and Kings County in addition, Defendants' principal places of business are located in New York County.

## PARTIES

7.      Plaintiff FRED IFILL (hereinafter "Mr. Ifill" and/or "Plaintiff") is an African American male. Plaintiff is a citizen of the United States and resides in The Bronx, New York. At all times relevant to the Complaint, Plaintiff was employed as a Court Officer with the State of New

York, New York State's Unified Court System. At all times relevant to the Complaint, Plaintiff had a satisfactory employment record and was qualified to perform the duties/functions of his job.

8.     Defendant, NEW YORK STATE COURT OFFICERS ASSOCIATION ("NYSCOA"), is a duly-formed labor union which advocates for the work-related rights and benefits of its Court Officer constituency pursuant to a collective bargaining agreement executed between NYSCOA and the State of New York.

9.     ASSOCIATION PRESIDENT DENNIS QUIRK (hereafter "Defendant Quirk) was at all times relevant to the Complaint, the elected President of, and union delegate within, the NYSCOA. Pursuant to his capacity as Union President, Defendant Quirk had a duty to advocate on behalf of, defend, and protect the rights of the Court Officers (including Plaintiff), who were members of the NYSCOA. Defendant Quirk Defendant Quirk is being sued herein in his individual and official capacities.

10.     Defendant MICHAEL P. DeMARCO ("Defendant DeMarco"), is a Court Officer within the New York State Unified Court System. At the times relevant to the Complaint, Defendant DeMarco held the title/rank of Major and served as one of Plaintiff's immediate supervisors. Defendant DeMarco is being sued herein in his individual and official capacities.

11.     Defendant JOHN POSILLIPO Defendant MICHAEL P. DeMARCO ("Defendant Posillipo"), is a Court Officer within the New York State Unified Court System.  At the times relevant to the Complaint, Defendant Posillipo held the title/rank of Captain and served as one of Plaintiff's immediate supervisors. Defendant DeMarco is being sued herein in his individual and official capacities.

## FACTUAL ALLEGATIONS

12.     On December 22, 2006, Plaintiff was on-duty and working his regular tour in

uniform when he was summoned by employees of the Unified Court System to report to his command office.

13.    Upon his arrival to the command office, Court Lieutenant Louie Cerrato together with Union Delegate Rick Carter, acting on behalf of the State Of New York Unified Court System, demanded that the Plaintiff surrender his firearms by order of Defendant MAJOR DEMARCO.

14.    Contrary to the collective bargaining agreement, no explanation was given to the Plaintiff for this job action, Plaintiff did not receive any official  notice from his employers or supervisors, Unified Court System, Defendant DEMARCO, and/or Defendant POSILLIPO regarding the reasons why his weapons were being ordered to be confiscated - despite Plaintiff's inquires.

15.    Plaintiff received no notice and/or explanation from the NYSCOA union, Plaintiff's Union representative/delegate, and/or Defendant QUIRK (as President and Union Representative) regarding the reasons that his weapons were being confiscated/surrendered despite Plaintiff's inquires.

16.    However, in addition to ordering Plaintiff to surrender his on-duty weapon,
       Members of the Unified Court System,  proceeded to escort the Plaintiff home to retrieve his second firearm (at the direction of Defendants DeMarco and Posillipo and the Unified Court System) without giving any explanation for their actions - contrary to the collective bargaining agreement.

17.    Plaintiff returned to duty the following day and worked his tour in uniform without any firearm or explanation of the Defendants' employment action. This upon itself was wholly shocking to the conscious and violated the collective bargaining agreement.

**DEFENDANTS DENNIS QUIRK AND NYSCOA**

18.    On December 27, 2006, three tours and five days later, Plaintiff was summoned to Defendant Association President DENNIS QUIRK'S Office by Defendant QUIRK.

19.    At that time, Defendant QUIRK referred to a December 8th, 2006 incident in which the Plaintiff and several other court officers struggled to arrest a combative, non-compliant resisting juvenile prisoner that had to be escorted out of a court room.

20.    At the time that the juvenile prisoner had to be physically restrained and escorted out of the courtroom Plaintiff (who is African American), along with another court officer Robert O'Brien (Caucasian), both actively and simultaneously seized the prisoner.

21.    Because the prisoner was combative and refused to obey orders to exit the courtroom, both Plaintiff and Office O'Brien were forced to take the prisoner to the floor, restrain the prisoner, and forcefully remove the prisoner back to his holding cell.

22.    Even though Plaintiff and Officer O'Brien engaged the juvenile prisoner in the same exact manner while in the Courtroom (as admitted by officer O'Brien), for some reason, the judge who sat in the courtroom and allegedly witnessed the entire incident chose to single-out Plaintiff alone (not the Caucasian Court Officer, O'Brien) to criticize the court officer's actions while handling the prisoner.

23.    Following the incident that took place in the court room, the prisoner began to struggle again and Plaintiff IFILL was caused to have to subdue and restrain the prisoner again while the prisoner was being escorted to an elevator within the court complex.

24.    Even though Plaintiff and Officer O'Brien engaged the juvenile prisoner in the same exact manner while in the Courtroom (as admitted to Defendants by Officer O'Brien), the Unified Court System, its employees, officers, and/or representatives (including Defendants DeMarco and Posillipo) singled-out Plaintiff alone, without a good-faith investigation into the incident.

25.    Even though Plaintiff and Officer O'Brien engaged the juvenile prisoner in the same exact manner while in the Courtroom (as admitted to Defendants by Officer O'Brien), the Unified

Court System, its employees, officers, and/or representatives (including Defendants DeMarco and Posillipo) singled-out Plaintiff alone for disciplinary action(s), without a good-faith investigation into the incident.

26.     Indeed, the Caucasian Court Officer's actions (O'Brien), who was equally as involved in the handling of this juvenile inmate within the Court Room, was never even questioned by the Unified Court System and/or its employees, including but not limited to Defendants DeMarco and Posillipo.

27.     Upon information and belief, the judge who made statements regarding the alleged conduct of Plaintiff sought disciplinary action against Plaintiff alone, and did not seek disciplinary action for the other (Caucasian) Court Officer that was also involved.

28.     Upon information and belief, following the statements regarding the alleged conduct of Plaintiff made by the judge, Defendants DEMARCO AND POSILLIPO sought disciplinary action against Plaintiff alone, and did not seek disciplinary action against the other (Caucasian) Court Officer that was also involved.

29.     Plaintiff and Officer O'Brien were similarly situated, and upon information and belief, Officer O'Brien informed Defendants of his involvement in the incident and advised Defendants that he was also involved in the incident with the juvenile prisoner.

30.     Though the Unified Court System, through its employees Defendants DeMARCO and POSILLIPO, had knowledge that this Caucasian Court Officer (O'Brien) was involved in the incident along with Plaintiff, the aforementioned did not take any disciplinary action against Officer O'Brien, nor did they suggest that Officer O'Brien's weapons should be confiscated as they did with respect to Plaintiff.

31.     Defendants and/or their employers State Of New York Unified Court System had no valid business-based justification for singling-out the African American Plaintiff alone despite evidence and clear-knowledge in their possessions that another Court Officer, who was Caucasian, was also involved in the incident with the juvenile prisoner.

32.     As a result of the incident, the juvenile prisoner was not injured, did not complain of injury, did not file any abuse complaint, and did not require medical treatment or hospital care. Plaintiff and officers continued to process the prisoner in accordance with Standard Operating Procedure.

33.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, "I no longer want you to work here."

34.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, "You are not a team player!"

35.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, "I want you to resign right now."

36.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, "I know that you are interviewing for a job with the Virginia Police Department. If you don't resign,  Judge Lauria and my daughter who works for the ADA office will have you arrested for Attempted Assault and Endangering the Welfare of a Minor."

37.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, "I will report this to the Virginia Police and you will not have either job!." Defendant Quirk was referring to Plaintiff's (then current) job with the Unified Court System, as well as Plaintiff prospective job with a police Department located in Virginia, for which

7

Defendant Quirk knew the Plaintiff was applying.

38.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant Quirk told Plaintiff, *among other things*, that Plaintiff's decision to resign had to made right there on the spot.

39.     Defendant Quirk placed Plaintiff in and unreasonable position wherein Plaintiff had to resign immediately (without consultation or advise of any kind) and/or face possible blacklisting for future employment and/or alleged criminal complaints against Plaintiff.

40.     During the December 27, 2006 meeting with Defendant QUIRK, Defendant QUIRK, without proof and with information proving otherwise, wrongfully accused Plaintiff of physically punching and/or assaulting the juvenile prisoner while in the elevator. Though there was a video tape of the incident that demonstrated that Plaintiff did not strike the juvenile inmate, Defendant Quirk unreasonably continued to accuse Plaintiff of striking the inmate.

41.     Though Plaintiff denied allegations of wrong-doing, advised Defendant Quirk that other officers that were present during the incident (including Officer O'Brien) could corroborate that Plaintiff did not assault the inmate, and requested that the union defend him with respect to any disciplinary action taken against Plaintiff, Defendant Quirk adamantly refused to listen to Plaintiff.

42.     In addition, Defendant Quirk, in no uncertain terms, also outright refused to afford Plaintiff any Union representation whatsoever after Plaintiff suggested and requested representation.

43.     Defendant QUIRK testified that, during this conversation with Mr. Ifill, Defendant QUIRK advised Mr. Ifill that the matter would also be forwarded to the district attorney's office for criminal investigation - on top of the administrative disciplinary action that Mr. Ifill was going to face.

8

44.     Defendant Quirk testified that, During this meeting with Mr. Ifill, Quirk told Mr. Ifill, among other things, that "this is choice A, you can resign and the thing goes away" (including the potential criminal prosecution).

45.     According to Defendant Quirk, "Choice B, was to stay and fight" and face criminal prosecution.

46.     Though Defendant QUIRK testified that he had no authority or control over any criminal investigations that could have resulted, Defendant QUIRK contrarily advised Mr. Ifill during this meeting that Mr. Ifill could "resign and the whole thing goes away."

47.     Defendant QUIRK, who's daughter is and Assistant District Attorney, and who also has many ties and political relationships with District Attorneys in New York advised Plaintiff that he could easily cause the District Attorney's Office to investigate and prosecute Mr. Ifill if he did not resign.

48.     The unlawful threats from Defendant Dennis Quirk was clearly in violation of Defendant Quirk's duties (as Union President and Delegate) to defend and advocate for the rights of Union Members (such as Plaintiff).

49.     The unlawful threats from Defendant Dennis Quirk was clearly in violation of the collective bargaining agreement (and Defendant Quirk's Duties thereto as Union President) to defend and advocate for the rights of active Union Members (such as Plaintiff).

50.     The unlawful threats from Defendant Dennis Quirk was clearly in violation of Defendant NYSCOA's duties under the collective bargaining agreement to defend and advocate for the rights of active Union Membership (such as Plaintiff).

51.     Upon information and belief, Defendant Quirk's, "team player" comment referred to

9

an incident in which the Defendant Quirk demanded that the Plaintiff purchase Court Officer shirts and other union paraphernalia during the period Plaintiff was in the training academy. The Plaintiff respectfully declined to purchase Defendant's personal paraphernalia, and by this, Defendant Dennis Quirk harbored ill will, resentment which manifested unlawful retaliatory animus against the Plaintiff. This set forth this egregious, unlawful, spiteful and retaliatory actions alleged in this Complaint.

52. During this meeting between Plaintiff and Defendant Quirk, the Plaintiff was alone and was not permitted to consult with anyone. Plaintiff was distraught and had no other choice to contemplate his ill wife and possible unemployment.

53. The Plaintiff knew the Defendant's allegation was baseless and erroneous but was threatened by the Defendant Dennis Quirk's notorious (and highly publicised) reputation for utilizing his power and authority as Union President to intimidate, upset, retaliate against, threaten, and coerce everyone from judges to officers within the Unified Court System (including those who had title, rank, and/or supervisory authority over Plaintiff).

54. At the time that the meeting took place between Defendant QUIRK and Plaintiff, wherein Plaintiff was being forced to resign, Plaintiff had not been served with any formal notice of discipline or any other such complaints from his employer Unified Court System or his supervisors (Defendants DeMarco and Posillipo).

55. No one from the Unified Court System, including but not limited to Plaintiff's supervisors Defendants Posillipo and DeMarco, ever filed any official complaints, grievances, reports, allegations of misconduct or any other disciplinary documents related to the incident against Plaintiff.

56. At the time that the meeting took place between Defendant QUIRK and Plaintiff,

10

wherein Plaintiff was being forced to resign,  Plaintiff had not been advised that any disciplinary action was ever initiated against him as a result of the incident with the juvenile prisoner.

57.    At the time that the meeting took place between Defendant QUIRK and Plaintiff, wherein Plaintiff was being forced to resign, there were no disciplinary charges, in any form, filed against Plaintiff by his employers Unified Court System.

58.    At the time that the meeting took place between Defendant QUIRK and Plaintiff, wherein Plaintiff was being forced to resign,  Plaintiff had not been informed that he was being investigated or that there was going to be an investigation into the incident at any time.

59.    Nevertheless, without any grievances, complaints, or notices of employment action against Plaintiff (of any kind), Plaintiff was awkwardly being forced to resign his position by Defendant Quirk - who was Plaintiff's Union representative - as opposed to Plaintiff's employer.

60.    During this meeting, Defendant Quirk, through his actual words and actions, made it unequivocally clear that the union was not going to assist Plaintiff with this job-related issue.

61.    Defendant QUIRK (Plaintiff's Union Rep) then contacted Defendant POSILLIPO (Plaintiff's employer/supervisor) and instructed Defendant POSILLIPO to prepare Mr. Ifill's resignation for Mr. Ifill at that time.

62.    Defendant QUIRK also instructed Defendant POSILLIPO (without assistance from Plaintiff) as to what Defendant POSILLIPO would write in Plaintiff's resignation letter.

63.    Defendant POSILLIPO did in fact, comply with Defendant QUIRK'S instructions and prepared the resignation letter (and the excuses for resignation therein) for Mr. Ifill, while Mr. Ifill was still down in Defendant QUIRK'S office.

64.    Mr. Ifill's resignation letter was prepared for Mr. Ifill and ready for Mr. Ifill's

signature only a few moments later - before Mr. Ifill had a chance to think further about the decision that he was being forced to make by Defendants QUIRK (union rep) and Plaintiff's employers/supervisors, Defendants DeMARCO and POSILLIPO.

65.     Defendant QUIRK did not afford (and affirmatively refused) Plaintiff's request to think about his options with his wife overnight.

66.     As a union member, Plaintiff was protected and was afforded employment-related rights under the collective bargaining agreement - including the right to contest and challenge any employment actions against him with representation from the NYCOA Union and/or Defendant Quirk..

67.     Pursuant to the collective bargaining agreement, the Union and Defendant Quirk had a duty to defend Plaintiff with respect to any work-related actions to be taken against him by his employer, Unified Court System.

68.     When Plaintiff asked Defendant Quirk for Union representation, Defendant Quirk unequivocally declined to assist Plaintiff in any regard. Instead, Defendant Quirk insisted that Plaintiff (who had no formal charges against him at that time) resign immediately.

69.     In refusing to assist Plaintiff, Defendants Quirk and NYSCOA willingly and intentionally violated the collective bargaining agreement and violated Plaintiff's state and federally protected rights to due process.

70.     In refusing to assist Plaintiff, Defendants Quirk and NYSCOA willingly, intentionally, and actively prevented Plaintiff from asserting his own due process rights under the collective bargaining agreement.

71.     Though Defendant QUIRK usually defends members of the union that are accused

12

of work-related and non work-related misconducted (regardless of the severity of the allegations against the union member), in Plaintiff's situation, Defendant QUIRK summarily refused to represent, defend, act on behalf of, and/or even make inquiries on Plaintiff's behalf as Plaintiff's Union Representative - in violation of the collective bargaining agreement.

## DEFENDANTS DeMARCO AND POSILLIPO

72.    At the time relevant to the Complaint, Defendant POSILLIPO was a Captain within the Unified Court System, who hand rank over Plaintiff and daily supervisory authority over Plaintiff.

73.    At the time relevant to the Complaint, Defendant DeMARCO  was a Major within the Unified Court System, who hand rank over Plaintiff and daily supervisory authority over Plaintiff.

74.    Both Defendants POSILLIPO and DeMARCO admit that Plaintiff Ifill was qualified for his position and performed his duties in a satisfactory manner according to their observations of Plaintiff and Plaintiff's satisfactory performance evaluations.

75.    During Plaintiff's tenure as a Court Officer with the Unified Court System, Plaintiff was never formally charged by his employer or his supervisors Demarco and/or Posillipo of any job-related misconduct.

76.    During Plaintiff's tenure as a Court Officer with the Unified Court System, Plaintiff was never formally disciplined and subjected to any official proceedings due to any actions taken while Plaintiff was acting in his official capacity as Court officer.

77.    On the evening of December 22, 2006 or December 23, 2006, following the incident related to Mr. Ifill and the juvenile prisoner that occurred earlier that day, memorial services were

being held for the mother of another Court Officer.

78.    Defendants QUIRK, DeMARCO, and POSILLIPO were all present at this funeral along with other employees of the Unified Court System. Plaintiff Ifill was not present during this memorial service.

79.    According to the testimony of Defendant DeMARCO, discussions were held at this funeral service regarding Plaintiff Ifill and the incident that occurred earlier that day.

80.    According to the testimony of Defendant DeMARCO, Defendant POSILLIPO and Judge Lauria (administrative judge) was involved in this conversation regarding Mr. Ifill, which took place during these memorial services.

81.    According to the testimony of Defendant QUIRK, Defendant QUIRK was also present at the aforementioned memorial service and "found out about" the apparent plan to subject Plaintiff to disciplinary action.

82.    More specifically, Defendant QUIRK (plaintiff's union rep) was also involved in this conversation between Defendants DeMARCO, POSILLIPO, and Judge Lauria (plaintiff's employers), wherein the "decision was made that they were going to refer [the December 22nd incident to the Inspector General's Office] and the district attorney."

83.    As a result of these meetings, between Defendants QUIRK (plaintiff's union rep), Defendants DEMARCO and POSILLIPO (Plaintiff's employers/supervisors) and Judge Lauria (administrative judge employed with UCS), Defendant DeMARCO contacted called Plaintiff's on-duty supervisor, *while DeMARCO was still attending the memorial service*, and instructed Plaintiff's on-duty supervisor to confiscate Plaintiff's weapons "immediately."

84.    Though Defendant DeMARCO suggested that Mr. Ifill be formally investigated for

the incident and suggested that the matter be referred to the Inspector General, Defendant DeMarco did not advise Plaintiff or Plaintiff's on duty supervisor as to the reasons why Mr. Ifill's guns were being confiscated - in violation of the collective bargaining agreement.

85.    None of Defendants - including Plaintiff's union representative who had knowledge of the actions being taken against Plaintiff Ifill, warned Mr. Ifill or advised him that his guns were being taken and/or the reasons why his guns were being removed.

86.    Though Defendant QUIRK, Plaintiff's union representative, knew at the memorial service that Defendants intended to take adverse employment actions against Plaintiff, and though Defendant Quirk allegedly took on *some* responsibilities consistent with a union representative for Plaintiff during this meeting with Co-Defendants, Defendant QUIRK did not inform Plaintiff (or any other union reps) of same.

87.    Defendants DeMARCO and POSILLIPO did not endeavor to file any complaints against Plaintiff as a result of the December 22, 2006 incident or take any official action against Mr. Ifill.

88.    Defendants DeMARCO and POSILLIPO were never advised by their employer, Unified Court System, that the UCS intended to file official charges or complaints against Mr. Ifill.

89.    Defendants DeMARCO and POSILLIPO were never advised by the Inspector General's Office, which is responsible for investigating complaints against Court Officers (such as Mr. Ifill) that the Inspector General intended to file official charges against or investigate Mr. Ifill as a result of the December 26, 2006 incident.

90.    Upon information and belief, Defendant's QUIRK, POSILLIPPO, and DeMARCO met, conferred, and openly and/or tacitly agreed and conspired to deprive Plaintiff of his right to due

15

process - in violation of the collective bargaining agreement.

91.     Upon information and belief, each Defendant conspired and formulated an agreement to force Plaintiff to resign his position as a court officer without undergoing any formal procedures to which Plaintiff was entitled under the collective bargaining agreement - in violation of the agreement.

92.     Upon information and belief, though Defendant QUIRK was supposed to represent the interests of Plaintiff, who was union member, Defendant QUIRK instead colluded with Plaintiff's employers and/or supervisors DEMARCO AND POSILLIPO to remove Plaintiff from his position under the threat of criminal prosecution and termination - in violation of the agreement and Plaintiff's right to due process.

93.     Upon information and belief (that information being Defendant QUIRK's testimony), the first day that Defendant Quirk returned to his office following the meeting between Defendant QUIRK and Co-Defendants, Defendant QUIRK summoned Plaintiff to his office -first thing in the morning - and threatened Plaintiff with criminal prosecution if Plaintiff refused to resign.

94.     Upon information and belief, Defendant QUIRK'S ultimatum to Plaintiff (to resign immediately of be subject to prosecution among other things) was determined during the "funeral meeting" with Co-Defendants and Judge Lauria, which Plaintiff was not a part of.

95.     Upon information and belief, the collective Defendants devised a plan to circumvent grievance procedures to which Plaintiff was entitled under the collective bargaining agreement - to the detriment of Plaintiff.

96.     Upon information and belief, the collective Defendants devised a plan to circumvent grievance procedures to which Plaintiff was entitled under the collective bargaining

agreement - to the detriment of Plaintiff's right to due process under the collective bargaining agreement and the Constitutions of the state of New York and the United States.

97.    Defendants decision and actions to force Plaintiff to resign was made by Defendants knowing that said decision and actions were contrary to Plaintiff's rights under the collective bargaining agreement and the administrative rules of the Unified Court System of the State of New York.

98.    Collective Defendants had no valid business justification to force Plaintiff to resign his employment without procedures entitled to Plaintiff under the collective bargaining agreement and the administrative rules of the Unified Court System.

99.    Collective Defendants were each acting pursuant to their own interests and contrary to the rules of the Unified Court System and the collective bargaining agreement.

100.    At the insistence of Defendant QUIRK, Plaintiff signed the resignation letter that was prepared by Defendant POSILLIPO and the direction of Defendant QUIRK.

101.    At the time that Plaintiff signed the resignation letter that was prepared for Plaintiff, Plaintiff was not afforded assistance form an unbiased union representative and Plaintiff was not advised of his rights pursuant to the collective bargaining agreement.

102.    Plaintiff was made to feel, as a result of the actions of Collective Defendants, that he had no other option but to forcefully resign his position. Plaintiff signed the resignation letter under duress, coercion, and intimidation - in violation of the collective bargaining agreement.

103.    As a result of Collective Defendants' actions towards Plaintiff, Plaintiff was caused to feel as though he had no recourse and could not challenge the actions being taken against him.

104.    On December 29, 2006, Plaintiff consulted with his fellow colleagues and court

officers about the circumstances surrounding his resignation. As a result, Plaintiff wished to submit a notice to the Unified Court System rescinding his coerced resignation.

105.    Unaware that Defendant POSILLIPO was involved in the decision to force Plaintiff's termination, Plaintiff sought advice from Defendant POSILLIPO regarding the steps he must employ to rescind his resignation and undergo a formal grievance process (if any).

106.    Contrary to the collective bargaining agreement and the administrative rules of the Unified Court System, Defendant POSILLIPO wrongfully advised Plaintiff that rescinding his resignation was "not something that could be done."

107.    Defendant POSILLIPO referred Plaintiff to Defendant DeMARCO for further advice and instruction.

108.    Upon seeking advice from Defendant DeMARCO, Plaintiff was again wrongfully advised about the process for reinstatement.

109.    Plaintiff sought assistance from Defendant QUIRK regarding reinstatement.

110.    Though Defendant QUIRK was the Union President and should have been informed of the proper procedure to rescind a resignation, Defendant QUIRK also wrongfully advised Plaintiff of the steps to seek reinstatement.

111.    More specifically, Defendant QUIRK instructed Plaintiff to fill out an application and obtain letters of recommendation and support from his fellow co-workers and also from the judges. Defendant QUIRK then advised Plaintiff that he would forward the application and letters to the Unified Court System and "see what happens."

112.    However, the Administrative rules of the Unified Court System did, in fact, contain provisions for recision of resignation. Under the circumstances, and pursuant to the aforementioned rules, Plaintiff would have been entitled to rescind his resignation and undergo formal grievance processes (if any existed at that time).

113.    Not only were the instructions given Plaintiff by the Collective Defendants grossly

incorrect, the instructions given to Plaintiff were unsupported by any rules, regulations, procedures, and/or the collective bargaining agreement.

114.    Plaintiff did indeed get many letters of recommendation and support form judges and other UCS employees, including a petition for reinstatement signed by many court officers. Plaintiff submitted the document to Defendants QUIRK, DeMARCO, and POSILLIPO.

115.    Nevertheless, Plaintiff's application was summarily denied by the Unified Court System.

116.    Upon information, the Chief Administrative Clerk of UCS was given Plaintiff's application and the supporting documents. The Chief Administrative Clerk then asked Defendants POSILLIPO and DEMARCO for their recommendations concerning reinstatement of Plaintiff.

117.    At all times, Defendants were aware that the Chief Clerk would rely on their opinions when deciding whether to reinstate Plaintiff.

118.    Defendants DEMARCO and POSILLIPO recommended that Plaintiff not be reinstated.

119.    When providing information to the Chief Clerk as to why Plaintiff should not be reinstated, Defendants DEMARCO and POSILLIPO sought to dissuade the reinstatement of Plaintiff by stating that Plaintiff was unfit to be a Court Officer.

120.    In support of their recommendations not to reinstate Plaintiff, Defendants relied upon allegations of misconduct, regarding Plaintiff, with which Plaintiff was never charged (formally or otherwise) or allowed to grieve and challenge under the collective bargaining agreement.

121.    Defendants DEMARCO AND POSILLIPO wrongfully utilized unsupported and unproven allegations of job-related and non-job-related misconduct by Plaintiff Ifill in order to taint his application for reinstatement - in violation of the collective bargaining agreement and

contrary to Plaintiff's right to due process.

122.   In their recommendations to the Chief Clerk, Defendants DEMARCO and POSILLIPO made it appear as though Plaintiff was formally charged, disciplined, and/or cited for misconduct on multiple occasions while he was a Court Officer.

123.   This was untrue. In fact, Plaintiff has never been formally charged with misconduct related to his official duties as a court officer.

124.   Further, thought Defendant DEMARCO and POSILLIPPO intentionally sought to make Plaintiff appear unfit for reinstatement due to alleged (uncharged) misconduct on the job, Defendants' recommendation materially contradicted Defendants' previous performance evaluations of Plaintiff - which stated that Plaintiff's job performance met and/or exceeded expectations.

125.   Defendants DEMARCO and POSILLIPO intentionally submitted inaccurate and misleading information regarding Plaintiff's work performance in furtherance of their intent to deprive Plaintiff of his right to due process.

126.   Based upon the recommendations of Defendants DEMARCO and POSILLIPO, on February 21, 2007, Chief Clerk James Kenny responded on behalf of the Unified Court System by notice to the plaintiff stating, "Reinstatement to the title of the New York State Court Officer has been denied." There was no explanation as to Defendant's decision.

127.   Chief Clerk James Kenny is neither the appointing authority nor Chief Executive responsible to decide reinstatement of Plaintiff.

128.   On March 26, 2007, Plaintiff timely filed charges of discrimination with U.S. EEOC (Charge No. 520200702233) and (Charge No. 520200702595). The U.S. EEOC found that their agency would not be able to timely investigate these charges and promptly authorize Notices of the Right to Sue the Defendants herein.

129.   On May 14, 2007, Plaintiff served notice via certified mail to Chief Executive

Officer Judge Judith S. Kaye requesting reinstatement pursuant to The Rules of the Chief Judge Standards and Administrative Policies § 25.28 sub. a-d(1) Resignation and Reinstatement following Resignation.

130.   Said rule states that  "A permanent employee who has resigned from his or her position may be reinstated, without examination, within (1) one year from the date of such resignation in the position from which such employee was eligible for transfer or reassignment. In computing the one-year period within which a person may be reinstated after resignation, the day the resignation takes effect."

131.   Though Plaintiff's aforementioned request was made pursuant to the rules of the Unified Court System.

132.   On June 26, 2007, Chief Executive Officer Judge Judith Kaye responded for Defendant State of New York Unified Court System by and through Assistant Deputy Counsel Pedro Morales in stating, "James Kenny informed you of the denial of your application. We refer you to that letter." At no time did the Unified Court System follow and/or adhere to their own rules, regulations, codes, and/or collective bargaining agreement regarding the decision to reinstate Plaintiff.

133.   Contrary to the Uniform Rules and the collective bargaining agreement, Plaintiff was never allowed to, and prevented from, challenging or grieving any incident of official misconduct, nor was Plaintiff allowed to take advantage of any formal procedure to which he was entitled under the collective bargaining agreement.

134.   As a result, Due to the Collective and individual actions of the Defendants herein, Plaintiff was wrongful denied all of his rights and benefits under the collective bargaining agreement and the administrative rules of the Court.

135.   Plaintiff attempted to challenge the actions (and/or lack thereof) of the Defendant Union and Defendant Quirk and the Unified Court System by filing a complaint with the Public Employer Review Board ("PERB").

136.   During a conference and/or meeting between Plaintiff, Defendant QUIRK, and several representatives of Plaintiff at the PERB conference, Defendant QUIRK did not deny that he failed to assist Plaintiff.

137.   Instead, Defendant QUIRK, in front of several witnesses, began to make statements regarding Plaintiff's personal life and affairs, which had nothing to do with Plaintiff's complaint of inadequate representation.

138.   During this PERB conference, Among other things, Defendant QUIRK improperly questioned how Plaintiff could afford to drive a Mercedes Benz on Plaintiff's court officer salary, causing Plaintiff to have to justify his personal life and property at the public forum.

139.   When it became apparent, during this PERB hearing, that Defendant QUIRKS' actions against Plaintiff rose to a constitution level and implicated Federal Questions, Plaintiff declined to proceed with the PERB hearing and filed a federal complaint alleging, among other things, due process violations.

140.   As a result of the collective actions of Defendants, Plaintiff was caused to suffer stress, humiliation, emotional injuries, loss of employment, loss of employment benefits, loss of future employment, loss of potential employment, loss of prospective employment, loss of salary, damages and injuries to his marriage and personal relationships, financial difficulties/hardship, special damages, including attorney's fees and costs. In addition, Plaintiff's wife, who suffers from health-related illness and who relied upon Plaintiff's employment for medical care, also suffered

injuries to her health, financial, and emotional well being.

## AS AND FOR THE FIRST CAUSE OF ACTION
### 42 U.S.C § 1983 - 14th Amendment Due Process Violation

141.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 140

of this Complaint, with the same force and effect as though herein fully set forth.

142.    The Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION,

ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN

POSILLIPO, acting under color of law, collectively and individually have engaged in actions and

abuses which have deprived Plaintiff of rights, privileges and immunities secured by the

Constitution including but not limited to the Fourteenth Amendment and other laws in violation of

42 U.S.C. § 1983. Each of the Defendants failed to prevent or intervene in the abuses set out above.

143.    Plaintiff is an African American male and thus belongs to protected class.

144.    Plaintiff, who was an active, paying member in good standing of the Defendant

NEW YORK STATE COURT OFFICERS ASSOCIATION was entitle to protections afforded

to members of the aforementioned Union.

145.    Plaintiff had a right an property interest in his employment as created by the terms

and conditions set forth in a valid duly executed collective bargaining agreement.

146.    Plaintiff had a right to the benefits conferred to each member of the Defendant

Union to due process and the right to be free from coercion, duress, and intimidation with

respect to the terms and conditions of his employment.

147.    Plaintiff had a right to be formally accused and/or charged with official misconduct,

through a process established within the collective bargaining agreement, and the right to grieve and/or challenge any such charges with a union representative.

148.    Plaintiff had a right to be properly and accurately informed by the Union, including Defendant QUIRK , of the proper procedures and protocol to employ in the event that Plaintiff is charged with misconduct.

149.    Plaintiff had a right to be defended (to the very end) by a union representative, regardless of the official charges or threat of charges being leveled against him.

150.    Plaintiff had a right to fair, equitable, and zealous representation by the Defendant Union and its employees, including, but not limited to Defendant QUIRK.

151.    Plaintiff had the right to be free from undue prejudice, scheming, and collusion between his employers and the Union regarding matters related to his official actions.

152.    All of the aforementioned rights and privileges rightfully belonged to Plaintiff as a member in good standing within the Court Officers Union.

153.    Plaintiff had a right to partial representation by the Union, without influence of any kind from his employers including but not limited to Defendants DEMARCO and POSILLIPO.

154.    Plaintiff, a public employee, had a property interest in continued employment not be to terminated (or forced to resign) without notice and hearing. Plaintiff had a property interest in reinstatement of employment pursuant to the rules of the Unified Court System.

155.    Through the collective and individual actions of Defendants herein, Plaintiff was denied all of the above rights, in violation of 42 USC § 1983.

156.    Though Plaintiff was being forced to resign due to alleged official misconduct, Plaintiff never received notice of, or an opportunity to participate in, either a proper arbitration

24

or the state court confirmation proceeding regarding the alleged conduct. Plaintiff was not afforded a full and fair opportunity to contest any decisions made or potential decisions of his employers due to the collective actions of Defendants.

157.    Defendant QUIRK as president of the Defendant NYSCOA was charged with the responsibility and duty to provide Plaintiff with full, fair and partial representation as well as proper advice and counseling with respect to Plaintiff's work-related issues.

158.    Yet, Defendant QUIRK, in his official capacity as a representative of the Defendant NYSCOA utilized his authority and position as President of the Union to coerce, intimidate, and force Plaintiff to resign his employment without the benefit of any protections afforded to Plaintiff under the collective bargaining agreement.

159.    Defendant QUIRK affirmatively conspired with Plaintiff's employers and supervisors Defendants DEMARCO AND POSILLIPO (who were all acting under the color of state law) to deprive Plaintiff of his due process rights as outlined in the above paragraphs.

160.    Defendant QUIRK'S acts were with the expressed and/or implicit approval of the Defendant NYSCOA, which took no actions to prevent the conspiracy between Defendants QUIRK, DEMACO and POSILLIPO, which were wholly contrary to Plaintiff's rights.

161.    Defendants POSILLIPO'S AND DEMARCO'S were state actors at all times and their acts were done with the expressed and/or implicit approval of the Unified Court System, which took no actions to prevent the conspiracy between Defendants QUIRK, DEMACO and POSILLIPO, which were wholly contrary to Plaintiff's rights.

162.    With knowledge of the wrongful actions against Plaintiff, Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS

25

QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO, allowed the hostile, uncomfortable and abusive environment to exist against Plaintiff, which led to Plaintiff's forced resignation and/or constructive discharge.

163.   As such, the collective Defendants acted with malice and reckless indifference to Plaintiffs' federally secured rights and their rights as secured by the Constitution of the State of New York. As asserted in the above paragraphs, Defendants agreed to deny Plaintiff privileges of the CBA and took affirmative steps to assure that Plaintiff would be deprived of his rights.

164.   As a direct result of the collective actions of Defendants, Plaintiff was caused to suffer stress, humiliation, emotional injuries, loss of employment, loss of employment benefits, loss of future employment, loss of potential employment, loss of prospective employment, loss of salary, damages and injuries to his marriage and personal relationships, financial difficulties/hardship, special damages, including attorney's fees and costs. In addition, Plaintiff's wife, who suffers from health-related illness and who relied upon Plaintiff's employment for medical care, also suffered injuries to her health, financial, and emotional well being.

165.   As a result of said Defendant's collective acts, Plaintiff suffered and is entitled to damages sustained to date and continuing in excess of two million($2,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT TWO
## IMPROPER EMPLOYER AND EMPLOYEE ORGANIZATION PRACTICES
### New York Civil Service Law §§ 209

166.   Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 165 of this Complaint, with the same force and effect as though herein fully set forth.

167.   As described in great detail above, Defendants QUIRK and NYSCOA  interfered

26

with, restrained and coerced Plaintiff (a public employee) in the exercise of his rights guaranteed under the collective bargaining agreement with the purpose of depriving Plaintiff of such rights.

168.    Defendant QUIRK and NYSCOA, along with the assistance of Defendants DEMARCO and POSILLIPO (also members of the Union and Plaintiff supervisors) intentionally discriminated against Plaintiff for the purpose of discouraging membership in, and participation in the activities of, any employee organization - in that Defendants subjected Plaintiff to differential treatment as compared to a similarly-situated Caucasian employee (Officer O'Brien), who was also involved in the incident that gave rise to Defendants' action above. Though Defendants were aware that Plaintiff was not alone when he subdued the juvenile inmate, Defendants refused to make minimal inquiry or investigation into the action of the White officer (O'Brien).

169.    Instead, Plaintiff alone, was wrongfully accused, and coerced into resignation and refused reinstatement of employment as alleged above.

170.    Defendants DEMARCO and POSILLIPO refused to negotiate in good faith with the duly recognized or certified representatives of Plaintiff and could not negotiate because said Defendant actively conspired with Defendants QUIRK and NYSCOA to prevent any such negotiations.

171.    The Collective Defendants refuses to adhere to and follow all the terms of an collective bargaining agreement with respect to Plaintiff herein.

172.    As alleged above, the Collective Defendants failed to permit, or refuse to afford Plaintiff (a public employee) the right, upon the Plaintiff's demand, to representation by a representative of the NYSCOA (employee organization), or the designee of such organization, when

27

it reasonably appeared that Plaintiff may have been the subject of a potential disciplinary action.

173. Although representation was requested by Plaintiff, and the Plaintiff was a potential target of disciplinary action, Plaintiff was forced to resign and was not afforded a reasonable period of time to obtain such representation and/or seek sound advice under the collective bargaining agreement.

174. As a direct result of the collective actions of Defendants, Plaintiff was caused to suffer stress, humiliation, emotional injuries, loss of employment, loss of employment benefits, loss of future employment, loss of potential employment, loss of prospective employment, loss of salary, damages and injuries to his marriage and personal relationships, financial difficulties/hardship, special damages, including attorney's fees and costs. In addition, Plaintiff's wife, who suffers from health-related illness and who relied upon Plaintiff's employment for medical care, also suffered injuries to her health, financial, and emotional well being.

175. As a result of said Defendant's collective acts, Plaintiff suffered and is entitled to damages sustained to date and continuing in excess of one million($1,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT THREE
## BREACH OF CONTRACT /COLLECTIVE BARGAINING AGREEMENT

176. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 175 inclusive of this complaint, with the same force and effect as though fully set forth herein.

177. The Defendants, NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO, extended a written, verbal, and implied offer of employment to Plaintiff, which carried

with it the implied promises that Plaintiff would be treated fairly and in good faith and would be entitle to representation and protections afforded under the collective bargaining agreement

178.    Plaintiff was a member (in good standing) of the Union. At all times relevant to the Complaint, Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO were members of the union, and/or were aware of Plaintiff's membership in the Union.

179.    Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO were, at all times, parties to the contract of a collective bargaining agreement ("CBA"). Plaintiff, as well as Defendants, were bound by the terms and conditions, as delineated in the CBA, and the defendants had duties to abide by the terms of said agreement.

180.    The collective bargaining agreement outlined procedures, practices and policies relative to disciplines, grievances, suspensions, investigations of alleged misconduct, and terminations of employment.  The collective bargaining agreement governed all factors affecting the terms and conditions of union members, such as Plaintiff.

181.    The Plaintiff performed in a satisfactory manner throughout the duration of his employment, and/or satisfied all of his requirements under the collective bargaining agreement.

182.    The Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO breached their duties to the Plaintiff under the collective bargaining agreement, when they engaged in unlawful retaliation, coercion, collusion, intimidation and other unlawful actions as outlined in the factual allegations, above, and failed to follow the policies, practices and

29

procedures regarding disciplines, grievances, suspensions, investigations of alleged misconduct, and terminations of employment.

183. Defendants NEW YORK STATE COURT OFFICERS ASSOCIATION, ASSOCIATION PRESIDENT DENNIS QUIRK, MICHAEL P. DeMARCO, and JOHN POSILLIPO breached the collective bargaining agreement when they wrongfully terminated the Plaintiff and when they misrepresented to the plaintiff the reasons for his resignation, misinformed Plaintiff of his rights and actively colluded to deprive Plaintiff of his rights.

184. As a result of the Collective Defendants' acts, Plaintiff suffered emotional distress, mental anguish, loss of employment, loss of rights afforded to her under the agreement, monetary injuries, among other things, and is entitled to a sum in excess of one million ($1,000,000.00) dollars in compensatory damages.

## RELIEF

**WHEREFORE,** Plaintiffs seek the following relief:

i.      Count One: in excess of one million ($2,000,000.00) dollars in compensatory damages, punitive damages and attorney's fees;

ii.     Count Two: in excess of one million ($1,000,000.00) dollars in compensatory damages, punitive damages and attorney's fees;

iii.    Count Three: in excess of one million ($1,000,000.00) dollars in compensatory damages, punitive damages and attorney's fees;

iv.     Costs, disbursements, and attorneys' fees pursuant to 42 U.S.C. § 1988;

v.      A declaratory judgement, stating that Defendants violated Plaintiffs' rights; and

vi.     Any and all other relief that the Court deems proper

## JURY DEMAND

### *PLAINTIFF DEMANDS A TRIAL BY JURY.*

30

Dated:      Hempstead, New York
            November 10, 2008

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON

                   By

                              GREGORY CALLISTE, JR. (GC8140)
                              FREDERICK K. BREWINGTON (FB5295)
                              *Attorneys for Plaintiff*
                              50 Clinton Street, Suite 501
                              Hempstead, New York 11550
                              (516) 489-6959

31