UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

FRED IFILL,

                      Plaintiff,              07 Civ. 7472 (JGK)

           - against -                        OPINION AND ORDER

NEW YORK STATE COURT OFFICERS
ASSOCIATION, ET AL.,

                      Defendants.
────────────────────────────────────

JOHN G. KOELTL, District Judge:

        This is an action by a former court officer, the plaintiff
Fred Ifill (the "plaintiff" or "Ifill"), who claims he was
forced to resign after allegedly using force against a juvenile
prisoner.  In the first of two incidents, the plaintiff
allegedly "body slammed" the juvenile at the conclusion of a
court proceeding, prompting the presiding judge to state on the
record that it was the worst show of force he had witnessed in
his twenty-nine years as an advocate and as a judge.  Shortly
after leaving court with the juvenile and other court officers,
the plaintiff was then caught by a video surveillance camera in
a court elevator pushing the juvenile to the floor of the
elevator and either striking or attempting to strike the
juvenile with his closed fist before being physically restrained
by other officers.  After the video of the second incident
surfaced, the plaintiff, allegedly under duress, tendered his
resignation.  Two days later the plaintiff changed his mind and

attempted to rescind his resignation.  His request to rescind was denied.

The plaintiff now brings this action against the New York State Court Officers Association (the "NYSCOA"), the NYSCOA President Dennis Quirk ("Quirk") (collectively with the NYSCOA, the "NYSCOA defendants"), Major Michael DeMarco ("DeMarco"), and Captain John Posillipo ("Posillipo") (collectively with DeMarco, the "State defendants") (State defendants collectively with NYSCOA defendants, the "defendants"), asserting claims under 18 U.S.C. § 1983, under New York Civil Service Law § 209, and for breach of contract/collective bargaining agreement.

The NYSCOA defendants and the State defendants each move separately for summary judgment dismissing the plaintiff's claims against them.  The plaintiff has also filed a cross-motion for partial summary judgment on the Section 1983 and breach of the collective bargaining agreement claims.

                                I.

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential
Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir.
1994).  "[T]he trial court's task at the summary judgment motion
stage of the litigation is carefully limited to discerning
whether there are genuine issues of material fact to be tried,
not to deciding them. Its duty, in short, is confined at this
point to issue-finding; it does not extend to issue-resolution."
Gallo, 22 F.3d at 1224.  The moving party bears the initial
burden of "informing the district court of the basis for its
motion" and identifying the matter that "it believes
demonstrate[s] the absence of a genuine issue of material fact."
Celotex, 477 U.S. at 323.  The substantive law governing the
case will identify those facts that are material and "[o]nly
disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)
(citing United States v. Diebold, Inc., 369 U.S. 654, 655
(1962)); Gallo, 22 F.3d at 1223.  Summary judgment is improper
if there is any evidence in the record from any source from

which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its initial burden, the burden shifts to the nonmoving party to come forward with "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).


                                II.

     The evidence submitted to the Court construed in the light most favorable to the plaintiff demonstrates that there is no dispute as to the following facts except where noted.

     From September 2003 and December 2006, Ifill was employed as a court officer by the New York State Unified Court System (the "UCS").  (State Defs.' Statement Pursuant to Local Civil Rule 56.1 ("State Defs.' 56.1 Statement") ¶ 1; Pl.'s Local Rule 56.1 Counter Statement with Respect to Defs. DeMarco and Posillipo ("Pl.'s Counterst. to State Defs.") ¶ 1.)  After graduating from the court officer training academy, Ifill was assigned to the Kings County Family Court in Brooklyn, New York.

                                4

(Defs.' NYSCOA and Dennis Quirk's Local Civil Rule 56.1
Statement of Undisputed Material Facts ("NYSCOA Defs.' 56.1
Statement") ¶ 5; Pl.'s Local Rule 56.1 Counter Statement with
Respect to Defs. NYSCOA and Ass'n President Dennis Quirk ("Pl.'s
Counterst. to NYSCOA Defs.") ¶ 5.)

On December 8, 2006, Ifill was working as a court officer
in the courtroom of Judge Stewart Weinstein, who was then
presiding over a matter involving a juvenile under the age of
sixteen.  (State Defs.' 56.1 Statement ¶ 6; Pl.'s Counterst. to
State Defs. ¶ 6.)  Ifill and another court officer were involved
in an incident involving the juvenile.  (State Defs.' 56.1
Statement ¶ 6; Pl.'s Counterst. to State Defs. ¶ 6.)  After the
incident, Judge Weinstein stated that he "wanted to put
something on the record" about the incident:

> [W]hen I said the parties were excused . . . , Officer
> Ifill focused on the respondent and said you're coming with
> me and tried to lift him out of his seat.  The respondent
> pulled back and tried to remain in his seat . . . .
> Officer Ifill then struggled with the respondent, who was
> just trying to get away from Officer Ifill's grasp, at
> which point Officer Ifilll appeared to me to be like an
> offensive tackle, body slammed him, knocked him off of his
> feet and fell on top of him on the floor, at which point
> [the juvenile] became quite hysterical, crying and
> screaming, but not aggressively.  Officer Ifill was being
> urged by myself and others to get off the [juvenile] but he
> was oblivious to our entreaties and was on top of the
> [juvenile] struggling with him . . . .
> And I want to emphasize [the juvenile], in no way, provoked
> this and deserved what happened.  I was very shaken up by
> it.  In twenty-nine years of being an advocate or a judge,
> I never saw an officer treat someone like that.

(State Defs.' 56.1 Statement ¶ 6; Pl.'s Counterst. to State
Defs. ¶ 6; Anspach Decl. Ex. B at 23-25.)

After the juvenile was removed from the courtroom, Ifill
and other court officers escorted the juvenile back to the
corrections area using a courthouse elevator reserved for the
transportation of prisoners.  (NYSCOA Defs.' 56.1 Statement ¶
37; Pl.'s Counterst. to NYSCOA Defs. ¶ 37; State Defs.' 56.1
Statement ¶ 9; Pl.'s Counterst. to State Defs. ¶ 9.)  A video
camera in the elevator captured a second incident with the
prisoner and the juvenile.  (NYSCOA Defs.' 56.1 Statement ¶ 38;
Pl.'s Counterst. to NYSCOA Defs. ¶ 38; Anspach Decl. Ex. D.)
The video shows Ifill, accompanied by two other court officers,
pushing the juvenile into a back corner of the elevator.
(Anspach Decl. Ex. D.)  The video then shows the juvenile
falling to the floor, the plaintiff hovering over him, and then
the plaintiff raising his clenched fist over the juvenile.
(NYSCOA Defs.' 56.1 Statement ¶ 40-41; Pl.'s Counterst. to
NYSCOA Defs. ¶ 40-41; Anspach Decl. Ex. D.)  According to the
defendants, the video shows Ifill's fist coming down toward the
juvenile, at which point other court officers appear to
intervene.  (NYSCOA Defs.' 56.1 Statement ¶ 42-43; State Defs.'
56.1 Statement ¶ 9.)  Ifill vigorously denies this allegation
and claims that the video "clearly shows that Mr. Ifill **_did not_**
hit the juvenile inmate," (Pl.'s Counterst. to State Defs. ¶ 9)

(emphasis in original), and that it shows him "attempting to grab/hold the juvenile to raise him up from the floor when the other officers intervened," (Pl.'s Counterst. to NYSCOA Defs. ¶ 42-43). The video is part of the summary judgment record and the Court has reviewed it. The video shows Ifill's closed fist coming down toward the juvenile on the floor, and then Ifill on top of the juvenile for several seconds before the other officers succeeded in pulling Ifill off the juvenile. (Anspach Decl. Ex. D.) The video does not show whether Ifill struck the juvenile or what happened before the other officers restrained Ifill, because those events occurred outside the view of the camera. (Anspach Decl. Ex. D.)

On December 22, 2006, two court officers, DeMarco and Posillipo, learned of the existence of the video. (NYSCOA Defs.' 56.1 Statement ¶ 49, Pl.'s Counterst. to NYSCOA Defs. ¶ 49; State Defs.' 56.1 Statement ¶ 10; Pl.'s Counterst. to State Defs. ¶ 10.) DeMarco is a court officer employed by the UCS and is responsible for supervising approximately 300 court officers working in the Family Courts within New York City. (State Defs.' 56.1 Statement ¶ 3; Pl.'s Counterst. to State Defs. ¶ 3; NYSCOA Defs.' 56.1 Statement ¶ 13; Pl.'s Counterst. to NYSCOA Defs. ¶ 13.) Posillipo is also a court officer employed by the UCS and is responsible for supervising approximately 87 court officers. (State Defs.' 56.1 Statement ¶ 4; Pl.'s Counterst. to

State Defs. ¶ 4; NYSCOA Defs.' 56.1 Statement ¶¶ 15-16; Pl.'s
Counterst. to NYSCOA Defs. ¶¶ 15-16.)  Posillipo supervised
Ifill during Ifill's tenure with the Kings County Family Court.
(State Defs.' 56.1 Statement ¶ 4; Pl.'s Counterst. to State
Defs. ¶ 4; NYSCOA Defs.' 56.1 Statement ¶ 16; Pl.'s Counterst.
to NYSCOA Defs. ¶ 16.)

At a wake for the mother of a court officer held that day,
December 22, 2006, DeMarco discussed the video with Posillipo
and Judge Joseph Lauria ("Lauria"), the Family Court
administrative judge.  (NYSCOA Defs.'56.1 Statement ¶ 50; State
Defs.' 56.1 Statement ¶ 11.)[1]  After speaking with Judge Lauria,
DeMarco's supervisor, DeMarco called a supervisor in the Kings
County Family Court and directed him to remove all of the
plaintiff's guns, a measure routinely taken following an
allegation of serious misconduct.  (State Defs.' 56.1 Statement
¶ 12; NYSCOA Defs.' 56.1 Statement ¶ 51-52; Pl.'s Counterst. to
NYSCOA Defs. ¶ 51-52.)

At a funeral for the court officer's mother held the next
day, December 23, 2006, or by telephone the day before, Quirk

---

[1] Ifill disputes this allegation on the basis that DeMarco and Posillipo also
discussed the video with Quirk at the wake, citing Quirk's deposition
testimony that Quirk had discussions about Ifill with Lauria, DeMarco,
Posillipo and another court officer "on a Saturday while attending a funeral
at a church."  (Pl.'s Counterst. to State Defs. ¶ 11; Pl's Counterst. to
NYSCOA Defs. ¶ 50.)   However, the plaintiff does not dispute that the wake
took place on a Friday, and that Quirk did not attend the wake.  (NYSCOA
Defs.' 56.1 Statement ¶ 50, 55.)  The plaintiff also does not dispute that
Quirk did attend the funeral of the court officer's mother the next day,
December 23, 2006, which was a Saturday.  (NYSCOA Defs.' 56.1 Statement ¶ 56;
State Defs.' 56.1 Statement ¶ 15; Pl.'s Counterst. To State Defs. ¶ 15.)

learned of the video and requested that a copy of the video be
sent to his office.  (NYSCOA Defs.' 56.1 Statement ¶¶ 58-59.)
Quirk is the President of the NYSCOA, a union which is
recognized as "the exclusive representative for negotiations"
with respect to court officers for the UCS within the City of
New York.  (NYSCOA Defs.' 56.1 Statement ¶¶ 6, 9; Pl.'s
Counterst. to NYSCOA Defs. ¶¶ 6, 9.)  On December 27, 2006,
Quirk viewed the video and called the plaintiff to his office
later that day.  (NYSCOA Defs.' 56.1 Statement ¶ 61; Pl.'s
Counterst. to NYSCOA Defs. ¶ 61; State Defs.' 56.1 Statement ¶
22.)  Quirk testified that before meeting with Ifill, he was
told by DeMarco or another court officer that a complaint about
Ifill's conduct would be forwarded to the District Attorney and
the Office of the Inspector General, but that a report would not
be forwarded if Ifill resigned immediately.  (Quirk Dep. 300,
302.)

When Ifill arrived in Quirk's office, Quirk and Ifill
reviewed the video showing the second incident in the elevator.
(Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1 Statement") ¶ 23;
Defs.' New York State Court Officers Ass'n and Quirk's Local
Civil Rule 56.1 Counterstatement of Material Facts and Statement
of Additional Facts ("NYSCOA Defs.' Counterst.") ¶ 23; State
Defs.' Counter-statement Pursuant to Local Civil Rule 56.1
("State Defs.' Counterst.") ¶ 23.)  Quirk testified that he then

9

told Ifill that Ifill could resign before the matter progressed any further, and that Ifill then decided to resign. (NYSCOA Defs.' 56.1 Statement ¶¶ 69-72.)  Upon Quirk's request, Posillipo prepared a letter of resignation for Ifill, and Ifill signed the letter later that day.  (NYSCOA Defs.' 56.1 Statement ¶¶ 73, 75, 79; Pl.'s Counterst. to NYSCOA Defs. ¶¶ 73, 75, 79.) Ifill claims that he was not given any time to consider Quirk's offer and that he signed the resignation letter "under duress." (Pl.'s Counterst. to NYSCOA Defs. ¶ 72.)

    Two days later, Ifill told Quirk that he wanted to rescind his resignation and wrote a letter to the court clerk rescinding his resignation.  (Pl.'s 56.1 Statement ¶¶ 65-66; NYSCOA Defs.' Counterst. ¶¶ 65-66; State Defs.' Counterst. ¶¶ 65-66.)  Quirk wrote a letter to the court suggesting that they rehire Ifill but informed Ifill that the reinstatement request would force the court to investigate the incidents involving the juvenile prisoner.  (Pl.'s 56.1 Statement ¶¶ 85-86; NYSCOA Defs.' Counterst. ¶¶ 85-86; State Defs.' Counterst. ¶¶ 85-86.)  On January 4, 2007, Ifill submitted an application for reinstatement.  (Anspach Decl. Ex. H.)  On January 22, 2007, the Deputy Chief Administrative Judge denied Ifill's reinstatement application.  (Anspach Decl. Ex. L.)  On February 21, 2007, the Chief Clerk wrote a letter to Ifill informing him that his

application for reinstatement had been denied.  (NYSCOA Defs.'
56.1 Statement ¶ 88; Meyer Decl. Ex. N.)

    On or about March 5, 2007, Ifill commenced a proceeding
before the Public Employment Relations Board ("PERB") against
the NYSCOA and the UCS.  (NYSCOA Defs.' 56.1 Statement ¶ 89;
Meyer Decl. Ex. O.)  Ifill chose not to proceed with a hearing
before PERB because he had decided to pursue his claim in
federal court.  (State Defs.' 56.1 Statement ¶ 60; Pl.'s
Counterst. to State Defs. ¶ 60.)  On August 13, 2007, the UCS
requested that Ifill's PERB charge be dismissed for failing to
appear and pursue his charge.  (State Defs.' 56.1 Statement ¶
61; Pl.'s Counterst. to State Defs. ¶ 61; Anspach Decl. Ex. T.)
On October 18, 2007, an administrative law judge dismissed
Ifill's PERB charge.  (State Defs.' 56.1 Statement ¶ 62; Pl.'s
Counterst. to State Defs. ¶ 62; Anspach Decl. Ex. U.)

    On August 23, 2007, Ifill filed this action, including
claims under 18 U.S.C. § 1983, under New York Civil Service Law
§ 209, and for breach of contract/collective bargaining
agreement, as well as claims under Title VII for racial
discrimination.  (State Defs.' 56.1 Statement ¶ 63; Pl.'s
Counterst. to State Defs. ¶ 63.)  On November 10, 2008, Ifill
amended his complaint to drop the UCS as a party and to withdraw
his Title VII race discrimination claims.  (State Defs.' 56.1

Statement ¶ 63; Pl.'s Counterst. to State Defs. ¶ 63; Anspach
Decl. Ex. A.)


                              III.

     All parties move for summary judgment on the Section 1983
claim.  To prevail on his Section 1983 claim, the plaintiff must
show that he was deprived of a right secured by the Constitution
or laws of the United States and that the deprivation was
committed or caused by a person acting under the color of state
law.  See Gomez v. Toledo, 446 U.S. 635, 640 (1980); Feingold v.
New York, 366 F.3d 138, 159 (2d Cir. 2004) (citing West v.
Atkins, 487 U.S. 42, 48 (1988)).  Furthermore, "personal
involvement of defendants in alleged constitutional deprivations
is a prerequisite to an award of damages under § 1983."  Back v.
Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d
Cir. 2004) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d
Cir. 1977)).

     Ifill asserts that the defendants deprived him of (1) his
alleged property interest in continued employment with the UCS,
(2) his alleged property interest in reinstatement, and (3) his
alleged interest in union representation by the NYSCOA
defendants in accordance with the terms of the collective
bargaining agreement.  The NYSCOA and the State defendants move
to dismiss all of Ifill's due process claims.  Ifill moves for

                              12

summary judgment on his due process claim based upon the alleged deprivation of his right to union representation.

**A.**

"Due process requires only that a hearing be held at a meaningful time and in a meaningful manner." Giglio v. Dunn, 732 F.2d 1133, 1135 (2d Cir. 1984) (citing Parratt v. Taylor, 451 U.S. 527, 540 (1981)).  In two similar cases involving allegedly coerced resignations, the Court of Appeals for the Second Circuit has held that a pre-coercion hearing was "neither feasible nor constitutionally required," and that the availability of an Article 78 proceeding satisfied the requirements of due process.  See Stenson v. Kerlikowske, 205 F.3d 1324, 2000 WL 254048, at *1 (2d Cir. Mar. 3, 2000); Giglio, 732 F.2d at 1134.  The Court of Appeals further explained: "When an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be determined in advance." Giglio, 732 F.2d at 1135.  In the case of a resignation, therefore, it makes little sense to demand a pre-deprivation hearing on whether or not the employee's resignation would be voluntary.  Id.

Ifill cannot prevail on his Section 1983 claim based upon the deprivation of his alleged property interest in continued employment because he did not avail himself of post-deprivation

due process through an Article 78 proceeding.  See id. at 1134-
35.  A determination in Ifill's case on whether or not his
resignation would be voluntary would have been difficult, if not
impossible, to make before Ifill had even made a decision on
whether or not to resign.  Moreover, holding a pre-deprivation
hearing may well have obviated the intended benefits of offering
Ifill the option to resign.  See id. at 1134 (observing that
resignation "is a much-used, face-saving device designed to
avoid the stigma of being fired"); see also Semorile v. City of
New York, 407 F. Supp. 2d 579, 583 (S.D.N.Y. 2006).

Ifill argues that there was no pre- or post-deprivation
proceeding available to him because there was no disciplinary
action taken against him which could be properly challenged in
an Article 78 proceeding.  However, it is generally the case
with resignations that there is no formal action by the employer
other than to accept the resignation.  It is also well
established that former employees may challenge the
voluntariness of their resignations through an Article 78
proceeding.  The fact that no formal disciplinary action was
taken against Ifill did not deprive him of the opportunity
provided by the state to seek Article 78 relief.  Indeed, the
thrust of the plaintiff's contentions is that he was coerced
into resigning and he could have challenged that alleged
coercion in an Article 78 proceeding.

Ifill also argues that he was unable to challenge the defendants' conduct in an Article 78 proceeding because he did not learn of the "secret plan" and "conspiracy" among the defendants to force Ifill to resign until discovery took place in this case.  However, Ifill was plainly aware of the underlying facts of his claim that he was allegedly forced to resign, as evidenced by his PERB complaint filed in March 2007 which alleges that Quirk, on behalf of the NYSCOA, forced him to resign, and which also alleges the participation of DeMarco and Posillipo.  Even if certain facts pertaining to an alleged secret plot to force Ifill to resign were unknown to Ifill, this would not render an Article 78 proceeding unavailable to him, because those alleged facts were not necessary to bring an Article 78 proceeding to protest his resignation.  See Semorile, 407 F. Supp. 2d at 583 (even assuming arguendo that plaintiff's superiors conspired with union to force him to resign, post-deprivation process under Article 78 was adequate to satisfy due process).

Because Ifill did not pursue an Article 78 proceeding which was available to provide due process, he has no due process claim based on the alleged deprivation of his property interest in continued employment.  That claim is therefore dismissed.

**B.**

15

The defendants also move to dismiss Ifill's claim that he was deprived of due process when his request for reinstatement was denied.  The defendants argue that denial of reinstatement cannot be the basis for a due process claim when, as here, the decision to reinstate an employee is discretionary and the employee has no entitlement to reinstatement.  Ifill fails to respond to this argument in his opposition and, indeed, characterizes the UCS's refusal to reinstate him as "discretionary."  (<u>See</u> Pl.'s Opp'n. Mem. 26.)

Ifill does not point to any state or federal law granting him entitlement to reinstatement.  The Rules of the Chief Judge of the State of New York provide only that "[a] permanent employee who has resigned from his or her position <u>may</u> be reinstated . . . ."  22 N.Y.C.R.R. § 25.28(d) (emphasis added).  Because the decision whether to reinstate a court officer is discretionary, Ifill has no property interest in being reinstated to his job as a court officer.  <u>See</u> <u>Clarry v. United States</u>, 85 F.3d 1041, 1046 (2d Cir. 1996); <u>Greene v. McGuire</u>, 683 F.2d 32, 34-35 (2d Cir. 1982).  His due process claim based on the refusal to reinstate him therefore fails.

### C.

Finally, Ifill argues that he was deprived of his right to a pre-discipline hearing pursuant to the collective bargaining

16

agreement between the UCS and the NYSCOA.  Article 24 of the
collective bargaining agreement governs "Disciplinary
Procedures" and by its terms protects officers and employees
from being "removed or otherwise subjected to any disciplinary
penalty" without first following certain procedures, including
holding a hearing upon the stated disciplinary charges.

The problem with Ifill's claim based on the alleged
deprivation of his rights under the collective bargaining
agreement is that, by Ifill's own admission, he was not
subjected to any disciplinary penalty, and therefore the
protections of Article 24--and the entitlement to a pre-
discipline hearing--do not apply to him.  Ifill responds to this
argument by asserting that the defendants' contemplation of
disciplinary action constituted an "alternative disciplinary
procedure" requiring the defendants to follow the procedures
outlined in Article 24.8.  However, the "alternative
disciplinary procedures" that are the concern of Article 24.8
refer to informal disciplinary proceedings.  In this case,
offering Ifill an opportunity to resign was not an informal
disciplinary proceeding, but an opportunity to avoid a
disciplinary proceeding altogether.  Because Article 24 does not
apply to Ifill's resignation, Ifill's claims based on the
defendants' failure to provide him with process due under the
collective bargaining agreement fails.

Because all of Ifill's Section 1983 claims fail as a matter of law, the Court need not address the numerous factual contentions raised by the parties, including the defendants' contention that there is no credible evidence that they conspired to deprive Ifill of any rights.  Accordingly, the defendants' motions for summary judgment on Ifill's Section 1983 claims are granted, and Ifill's motion for partial summary judgment on this claim is denied.

## IV.

The defendants move for summary judgment on Ifill's claim under New York Civil Service Law § 209-a.  Section 209-a makes unlawful various practices by a public employer or an employee organization, including unions.  Civil Service Law § 205(5)(d) provides PERB with authority to issue cease and desist orders to prevent improper practices under § 209-a and to take affirmative action.  Section 205(5)(d) also provides that PERB "shall exercise exclusive nondelegable jurisdiction of the powers granted to it by this paragraph."  See also Zuckerman v. Bd. of Educ. of City Sch. Dist. of City of New York, 376 N.E.2d 1297, 1300 (N.Y. 1978) ("[A]n improper labor practice . . . is within the exclusive jurisdiction of PERB.").  New York courts have dismissed claims of improper labor practices pursuant to Section 209-a on the grounds that such charges are within the exclusive

jurisdiction of PERB.  See Peele v. New York City Dep't of Soc.
Servs./Human Res. Admin., No. 92 Civ. 3765, 1995 WL 728478, at
*1-2 (S.D.N.Y. Dec. 8, 1995); Westchester County Dep't of Pub.
Safety Police Benevolent Ass'n, Inc. v. Westchester County, 828
N.Y.S.2d 412, 414 (App. Div. 2006).

      Ifill argues that PERB does not exercise exclusive
jurisdiction over his Section 209-a claim, but he cites as
support for this argument a case that indicates that PERB does
have exclusive jurisdiction over claims brought under Section
209-a.  See Portnoy v. Groth, No. 84 Civ. 0172, 1984 WL 1363, at
*2 (S.D.N.Y. Dec. 19, 1984).  That case merely observed that a
state court in a related proceeding had held that "PERB had
exclusive jurisdiction over claims predicated on violations of
the state's Civil Service Law, not over constitutional claims
pursuant to section 1983."  Id.[2]  Ifill appears to argue that
because he brings Section 1983 claims alleging violations of due
process, which are properly in federal court, he may also bring
his Section 209-a claims.  However, this Court may not exercise
supplemental jurisdiction over claims over which an
administrative agency has exclusive jurisdiction.  Because PERB

---

[2] There is an exception to PERB's exclusive jurisdiction when the claim is for
a breach of the duty of fair representation.  See DeCherro v. Civil Serv.
Employees Ass'n, Inc., 400 N.Y.S.2d 902, 903 (App. Div. 1977).  Ifill does
not distinguish here between claims for the breach of the duty of fair
representation under the CBA and under the N.Y. Civil Service Law § 209-
a(2)(c).  Summary judgment on this claim is appropriate for the reasons
explained below.

exercises exclusive jurisdiction over Section 209-a claims,
Ifill's Section 209-a claims must be dismissed.

**V.**

The NYSCOA defendants and Ifill both move for summary
judgment on Ifill's "breach of contract/collective bargaining
agreement" claim.   The NYSCOA defendants argue that, as a matter
of law, Ifill cannot bring a cause of action for breach of a
collective bargaining agreement against the NYSCOA because a
union member may not bring a breach of collective bargaining
agreement claim against his union, and can only bring an action
for breach of the duty of fair representation.   Ifill responds
that his claim is in fact a hybrid claim under Section 301 of
the federal Labor Management Relations Act ("LMRA"), including a
claim against the employer for breach of the collective
bargaining agreement and a claim against the NYSCOA for breach
of the duty of fair representation.   See DelCostello v. Int'l
Bhd. Of Teamsters, 462 U.S. 151, 164-65 (1983); White v. White
Rose Food, 237 F.3d 174, 178-79 (2d Cir. 2001).   His motion
papers also assert that the defendants are liable for breach of
the duty of fair representation.   Thus, although the amended
complaint states no claim for breach of the duty of fair
representation, nor any hybrid Section 301/fair representation
claim, the Court considers the parties' arguments with respect

to both the claim for breach of contract/collective bargaining
agreement and the claims relying upon a breach of the duty of
fair representation.

**A.**

Under New York law, a union member has no cause of action
against his union for breach of a collective bargaining
agreement between his employer and his union.  Herington v.
Civil Serv. Employees Ass'n, Inc., 516 N.Y.S.2d 377, 378 (App.
Div. 1987) ("[P]laintiff has no cause of action against his
union either for breach of contract or for negligence arising
out of the performance of duties assumed under the collective
bargaining agreement; his sole remedy is an action for breach of
fair representation."); Gorga v. Amityville Teachers' Ass'n, 808
N.Y.S.2d 917 (Sup. Ct. July 1, 2005).  Ifill's third claim for
relief under a theory of "breach of contract/collective
bargaining agreement" therefore fails.

Dismissal of the breach of contract/collective bargaining
agreement claims against Quirk, DeMarco, and Posillipo is also
proper because none of those individual defendants were parties
to the collective bargaining agreement or to any other contract
between the UCS and NYSCOA.  See E.E.O.C. v. Waffle House, Inc.,
534 U.S. 279, 294 (2002); Black Car and Livery Ins., Inc. v. H &
W Brokerage, Inc., 813 N.Y.S.2d 751, 752 (App. Div. 2006).  The

NYSCOA defendants' motions for summary judgment on the claim for breach of contract/collective bargaining agreement is therefore granted, and Ifill's motion for partial summary judgment is denied.

### B.

Although there is no breach of the duty of fair representation claim or hybrid Section 301/fair representation claim stated in Ifill's amended complaint, Ifill nonetheless argues in his papers that he is entitled to summary judgment on such a claim.  The defendants contend these claims should be dismissed on multiple grounds:  first, neither claim is pleaded in Ifill's amended complaint; second, Ifill, as a state employee, cannot bring breach of the duty of fair representation claim under federal law; third, any state law claim for breach of the duty of fair representation is time-barred; and fourth, a claim under state law could not hold Quirk personally liable.

Indeed, the amended complaint does not state a claim for breach of the duty of fair representation, nor does it include any mention of Section 301, the LMRA, or a hybrid claim.  Ifill may not amend his complaint to add new claims by raising them for the first time in his motion papers.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (rejecting new claim raised for first time in plaintiff's opposition to a motion to

dismiss); Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.
Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to
amend his pleading through statements in his brief.").  On this
ground alone, Ifill's breach of the duty of fair representation
claim and hybrid claim under Section 301 of the LMRA must be
dismissed.

        The defendants also correctly point out that Ifill may not
avail himself of Section 301 of the LMRA because the LMRA
excludes from the scope of its coverage employees who work for
"any State or political subdivision thereof."  Baumgart v. Stony
Brook Children's Serv., P.C., No. 03 Civ. 5526, 2005 WL 2179429,
at *5-6 (E.D.N.Y. Sept. 9, 2005); 29 U.S.C. § 152.  Because the
UCS is a political subdivision of the State of New York, Ifill
may not bring a hybrid Section 301/fair representation claim or
a claim for breach of a federal duty of fair representation
against either the UCS or the NYSCOA.  Therefore, to the extent
Ifill has pleaded a cause of action based upon a federal duty of
fair representation, that cause of action must fail.

        Furthermore, both a state law claim for breach of the duty
of fair representation and a hybrid Section 301/fair
representation claim under federal law would be time-barred.
Under New York law, the statute of limitations on a claim for
the breach of the duty of fair representation is four months
from the date the employee knew or should have known that the

breach has occurred, or four months from the date the employee
suffers actual harm, whichever is later.  N.Y. C.P.L.R. §
217(2)(a).  For Ifill, the date on which he knew or should have
known that the NYSCOA allegedly breached its duty of fair
representation is the same as the date on which he suffered
actual harm – December 27, 2006, the date he was allegedly
forced to resign.  Because Ifill did not file his original
complaint in this action until August 23, 2007, these claims are
time-barred.  Even assuming that he was not on notice of the
breach or did not suffer actual harm until February 21, 2007,
the date Ifill was notified that his application for
reinstatement had been denied, the claims would still be barred.

Under federal law, a hybrid Section 301/fair representation
claim must be brought within six months of the date the unlawful
labor practice occurred.  29 U.S.C. § 160(b); DelCostello, 462
U.S. at 169.  Even with the longer statute of limitations
applicable to hybrid Section 301/fair representation claims,
Ifill's claims would still be untimely because he did not file
suit within six months of either his allegedly forced
resignation or the denial of his application for reinstatement.[3]

---

[3] The letter from the Chief Clerk of the UCS informing Ifill that his
application for reinstatement had been denied was dated February 21, 2007,
and Ifill claimed in his PERB charge that he received the letter on February
21, 2007.  Courts have generally construed the six-month limitations period
found in 29 U.S.C. § 160(b) to refer to six calendar months rather than 180
days.  See Dowty v. Pioneer Rural Elec. Coop., 573 F. Supp. 155, 158 n.2
(S.D. Ohio 1983).  In any event, based on a limitations period of six

24

Finally, "it is well established that 'union officers and employees are not individually liable to third parties for acts performed as representatives of the union.'" Duane Reade, Inc. v. Local 338 Retail, Wholesale Dep't Store Union, 777 N.Y.S.2d 231, 237 (Sup. Ct. 2003) (citation omitted).  It is undisputed that Quirk allegedly committed the acts at issue in this case in his capacity as a NYSCOA President.  Even if Ifill's allegations are taken as true, Quirk cannot be held individually liable for acts performed as part of his duties as a representative of the NYSCOA.

As with Ifill's Section 1983 claims, his breach of contract/collective bargaining and breach of the duty of fair representation claims fail as a matter of law.  It is therefore unnecessary to reach the arguments whether the evidence establishes that the NYSCOA did not breach a duty of fair representation and thus this claim as well as the hybrid claim must fail.  Accordingly, the Court grants the defendants' motions for summary judgment dismissing Ifill's breach of the duty of fair representation claim and his hybrid Section 301/fair representation claim to the extent those claims are pleaded.  Ifill's motion for partial summary judgment on these claims is denied.

---

calendar months, which in this case results in a longer limitations period than the use of 180 days, Ifill's time to file a timely hybrid § 301/fair representation claim expired on August 21, 2007.  His complaint in this action, filed two days later, was therefore untimely.

## CONCLUSION

The Court has carefully considered all of the parties'
arguments.  To the extent not specifically addressed in this
Opinion, they are either moot or without merit.  For the reasons
explained above, the NYSCOA defendants' motion for summary
judgment is **granted,** the State defendants' motion for summary
judgment is **granted**, and the plaintiff's motion for partial
summary judgment is **denied**.  The Clerk is directed to close
Docket Nos. 26, 33, and 39.  The Clerk is directed to close this
case and to enter Judgment in favor of the defendants.

**SO ORDERED.**

**Dated:     New York, New York**
**           September 17, 2009**

John G. Koeltl
United States District Judge

26